INEZ C. ROBB et al., Plaintiffs, *v.* CINEMA FRANCAIS, INC., Defendant.

Supreme Court, Special Term, New York County, January 17, 1949.

*Lewis M. Isaacs, Jr.,* and *Murray Sendler* for plaintiffs.

*Charles A. Cohen* for defendant.

WALTER, J. Fifteen of the twenty-one tenants of defendant's eleven-story apartment building at 31 West 12th Street here complain that defendant has curtailed or eliminated essential services which were being furnished when they first became tenants in the building and on March 1, 1943, and on March 31, 1948, and they sue to compel defendant to restore such services and for damages and other relief.

Consolidated with their action are thirteen proceedings brought by defendant in the Municipal Court against thirteen of the plaintiffs to dispossess them for nonpayment of the rent which became due November 1, 1948. One of plaintiff tenants paid her rent due that day, and in the dispossess proceeding

brought against the remaining plaintiff a jury trial was demanded and consolidation of it with the action in this court was not asked.

From a date long prior to March 1, 1943, until some time in July, 1948, defendant furnished elevator service by means of a commodious passenger elevator large enough to accommodate baby carriages and sizable pieces of furniture as well as about thirteen persons, which moved with considerable speed and for the operation of which a human operator was supplied twenty-four hours in the day. Defendant also supplied a superintendent who lived upon the premises and was available to and did assist the tenants in various ways and made minor repairs in the apartments when needed. Defendant also supplied heat, hot and cold running water, refrigerators and cooking stoves, and made interior and exterior repairs.

Between about July 12, and October 29, 1948, defendant removed that elevator and installed in its place a smaller elevator of the so-called automatic type, which the tenants themselves operate by means of push buttons. That elevator is too small to accommodate regular size baby carriages or sizable pieces of furniture or more than eight or nine persons and moves with much less speed. It also has hinge doors instead of sliding doors, so that when the doors open they open toward the entrance door of one of the two apartments on the floor at which it has stopped and in such juxtaposition to such door as practically to block entrance to or exit from that apartment while the elevator is stopped at that floor.

Defendant has also dispensed with the services of the elevator operators. Its employees now are (1) a man who comes on duty at 3:00 P.M. and remains until midnight and during that time watches the door, does some cleaning in the lobby and public halls, and sometimes will operate the elevator for tenants who do not know how or are afraid to operate it; (2) a superintendent who lives on the premises, removes the garbage, distributes the mail, not always accurately, does some cleaning, and makes some minor repairs; and (3) a relief man who comes on duty on the days off of one or the other of the two employees first mentioned.

Instead, therefore, of living in an apartment constantly serviced by elevator men who, in addition to operating the elevator, assisted the tenants with their packages, children and guests and in getting in and out of the building, plaintiffs find themselves in a building, the halls, door and elevator of which are wholly unattended from midnight until three o'clock the next

afternoon. They also find their ingress to and egress from their apartments substantially interfered with by the hinge doors and smaller size of the new elevator.

Late in 1945 or early in 1946, the dumbwaiter by means of which small packages were delivered to and garbage was taken from the apartments on the east side of the building broke down, and it was not restored to operation until sometime in November or December, 1948. While it was out of working order garbage from those apartments was removed by employees of defendant, but as a practically unavoidable incident of that method of removal garbage frequently was seen in front of the front doors of some of the apartments and in the elevator which the tenants necessarily used in going to and from their apartments.

Defendant still employs a superintendent who lives on the premises, but the absence of any telephone or announcing system or elevator operators makes it impossible for the tenants to call him or consult him except by going to his apartment in the basement. There also is apparently no way for visitors calling upon tenants to announce themselves or make their presence known except by going to the apartment of the particular tenant upon whom they are calling; and for persons unfamiliar with or somewhat afraid of the type of elevator which defendant has now installed, the situation is quite difficult, especially if such person be calling upon a tenant who lives far above the street level. Defendant, somewhat audaciously as it seems to me, has advised the tenants that when funds are available its intention is to construct a vestibule at the front entrance and install a system for communicating with the apartments, but it offers no intimation as to when if ever it will have funds available for that purpose.

On more than one occasion defendant has failed for unreasonably long times to make needed repairs to plumbing, refrigerators and stoves in more than one apartment.

In at least several of the apartments the wooden window frames and the glass panes have been allowed to be loose for unreasonably long times.

One of the main walls of the building was allowed to become so out of repair that rain water came through it into one apartment for an unreasonably long time. A ventilator in another apartment was allowed to be so out of repair that for a long time it could not be closed when weather conditions made closing necessary or desirable. Paint and plaster in some of the apartments peeled and came off and the wall paper in some became discolored from leaking water. The refrigerators in some of

the apartments do not function properly and have been allowed to remain in that condition a long time. Defects in plumbing have not been repaired with reasonable promptness, and in one apartment there has been no running water in one of the bathrooms in the fourteen months that tenant has been occupying the apartment.

There also have been failures to furnish heat when heat was required for health as well as comfort.

By the leases of all plaintiffs except Levine, the landlord covenants to furnish, insofar as existing facilities provide, elevator service, hot and cold water in reasonable quantities at all times, and heat at all reasonable hours during the cold season. Interruption or curtailment of any of such services shall not constitute a constructive or partial eviction nor, unless caused by the gross negligence of landlord, entitle tenant to any compensation or abatement of rent. Landlord may discontinue manually operated elevator service upon ten days' notice to tenant, provided that within a reasonable time after the expiration of such ten-day period landlord shall commence the substitution of automatic-control type of elevator in lieu of the manually operated elevator, and with due diligence pursue to completion the installation of such automatic-control elevator.

Under such leases the mere substitution of the automatic-control type of elevator in place of the manually operated type was not in itself a breach of contract on the part of defendant. Defendant did not give the prescribed ten days' notice before starting the installation of the new elevator, but the failure to give it does not in my opinion defeat its right to make the substitution.

The change from the old elevator to the new took an unreasonably long time and I find that the work of installing the new one was not pursued with due diligence, but I cannot find that the interruption of service due to the change of elevators was caused by gross negligence on the part of defendant.

But while defendant here had a right to substitute the automatic-control type of elevator for the manually operated elevator if it could do so without substantially lessening or interfering with the tenants' use and enjoyment of their apartments, its possession of that right gave it no right substantially to lessen or interfere with such use and enjoyment; and I find that here the substitution has in fact had the effect of substantially lessening and interfering with such use and enjoyment.

Furthermore, a landlord who contracts to furnish elevator service does not comply with his contract by simply furnishing an elevator by means of which the tenants themselves can furnish their own service (*Goldberg* v. *Grant*, N. Y. L. J., Nov. 4, 1948, p. 1032, col. 6, mod. 274 App. Div. 993).

Defendant's elimination of the elevator men, its substitution of a smaller, slower elevator with hinge doors for the former larger, faster elevator with sliding doors, its failure to keep plumbing, stoves and refrigerators in proper working order, its failure to keep the furnishings in the lobby and public halls in cleaner and more presentable condition, its failure to keep exterior walls in proper repair, its failure to eliminate leaks and sweating in and around pipes which has caused paint and paper in the apartments to peel and become discolored and plaster therein to loosen and fall, all add up to a situation which clearly entitles the tenants to some relief if there be a legal principle upon which the court can act in awarding it.

Prior to 1918, the short, and perhaps the only, answer the law would make to tenants situated as these plaintiffs are situated doubtless would have been, "If you do not like it move out." Since then, repeated housing shortages have made that answer inadequate to the ends of justice, and have accustomed us to statutory enlargements of the rights and remedies of tenants which doubtless were undreamed of thirty years ago. The "moving out" which in past times afforded the tenant a ready and adequate remedy is now about the last thing he wants to do, and in most instances is something he is wholly unable to do.

Such being the circumstances I think I would not be stretching the law beyond the limits of logic or the ends of justice if I were to hold that the situation I have described amounts to a partial eviction.

Partial eviction by act of the landlord suspends the entire rent (*Fifth Avenue Building Co.* v. *Kernochan*, 221 N. Y. 370, 373).

That seems too drastic, and as I think a just result can be reached under the Federal rent laws I here refrain from making a holding of partial eviction.

By regulations promulgated under the Emergency Price Control Act of 1942 (U. S. Code, tit. 50, Appendix, § 901 *et seq.*), the maximum reasonable rents of the apartments of these plaintiffs were fixed at the rents thereof on March 1, 1943 (see *Pollack* v. *Seidman*, 82 N. Y. S. 2d 516). That limitation terminated on July 1, 1947, the effective date of the Housing and Rent Act

of 1947 (U. S. Code, tit. 50, Appendix, § 1893), but that act also provides (§ 1894) that from the effective date thereof until it ceases to be in effect no person shall demand, accept or receive rent greater than the maximum established under the act of 1942 and in effect with respect thereto on June 30, 1947, except that by valid written lease made in good faith on or before December 31, 1947, taking effect after June 30, 1947, and expiring on or after December 31, 1948, a landlord and tenant may voluntarily agree upon a rent which does not represent an increase of more than 15% over the maximum rent which would otherwise apply.

The maximum rent in effect on June 30, 1947, was then again continued by the Housing and Rent Act of 1948 (Public Law 464 [80th Cong., 2d Sess.], ch. 161, approved March 31, 1948).

All plaintiffs are in possession under leases which were made and took effect before June 30, 1947, and expired before December 31, 1948, except plaintiffs Carter, Kidder, Stroud, Moore, Higgins, Gaegen and de Marguerie. Those seven entered into leases which took effect after June 30, 1947, and expired on December 31, 1948. As to all except those seven, therefore, the maximum legal rent is the rent which existed on March 1, 1943 (except that under authority of those Federal statutes, the Federal rent director made orders on March 31, 1948, May 18, 1948, June 10, 1948, and July 26, 1948, by which the rents of the following apartments were increased to the following amounts: 2-E to $114.50; 3-E to $119.50; 5-E to $130.00; 5-W to $156.00; 7-E to $164.75; 9-E to $162.50; 9-W to $173.25; 11-WB to $93.50) and, as to the seven plaintiffs who made new leases taking effect after June 30, 1947, the maximum legal rent is the rent which existed on March 1, 1943, plus not in excess of 15% thereof, namely, the rents specified in such new leases.

Plaintiffs' counsel urge that the 1947 leases of those seven plaintiffs are invalid because not made in good faith, but I perceive no evidence which supports that claim.

As a mere matter of dollar figures, therefore, all plaintiffs are paying and defendant is demanding no more than the maximum legal rent applicable to each plaintiff; but a regulation of the Housing Expediter promulgated under the Housing and Rent Act of 1947 provides that every landlord shall, as a minimum, provide the same living space, services, furniture, furnishings and equipment as he was required to provide on March 31, 1948, and that a reduction in such services, furniture, furnishings or equipment shall constitute an acceptance of rent higher than the maximum rent.

I find that defendant has reduced the services, furniture, furnishings and equipment which it was furnishing on March 1, 1943, and was required to furnish on March 31, 1948, and in that way it has demanded, received and accepted and is demanding rent higher than the maximum rent.

There is thus presented the important question as to what are the rights and liabilities of landlord and tenant where the landlord by a reduction of services has made the dollar figures apparently applicable to an apartment a rent actually in excess of the maximum legal rent.

In *Fisher* v. *Benjamin* (182 Misc. 489), it was held that a landlord who has reduced services nevertheless may collect the rent which but for such reduction would be the legal rent; and some of the regulations of the Housing Expediter contain language which indicates that view and is suggestive of the idea that it is up to the tenant to apply to the Housing Expediter for a determination of what the rent should be in view of the reduction of services and then recover from the landlord the difference between what he has paid and the amount the Housing Expediter determines was the proper rent in view of the reduction in services.

I cannot accept that view. It runs counter, I think, to the entire spirit and intent of the statute and tends to facilitate evasions thereof by landlords, and it expressly contradicts and nullifies the specific statutory direction that no person shall demand, accept or receive any rent greater than the maximum rent established under the authority of the statute.

That specific statutory direction seems to me to require the conclusion that a landlord who has reduced essential services cannot demand, accept or receive the rent which except for such reduction of services would be the rent legally collectible.

But does it follow that such a landlord cannot collect any rent or merely that he cannot collect an amount beyond the amount to which the otherwise legally collectible rent is reduced by reason of such reduction of services? If the latter alternative be adopted as imposing the lesser hardship upon the landlord, then it is necessary for the court to determine the amount by which the legally collectible rent is reduced by reason of a reduction of services, and it doubtless is a fair question whether a State court has jurisdiction to make such determination.

Under the act of 1942 and also under the act of 1947 any person who demands, accepts or receives any payment of rent in excess of the maximum rent is liable to the person from whom

he demands, accepts or receives such payment for reasonable attorney's fees and costs plus liquidated damages in the amount of $50 or three times the amount by which the payment exceeds the maximum rent which could lawfully be demanded, provided that the amount of such liquidated damages shall be the amount of the overcharge if defendant proves that the violation was neither willful nor the result of failure to take practicable precautions against the occurrence of the violation. No such proof has been given here. Suit to recover such amount may be brought in any Federal, State or territorial court of competent jurisdiction.

As State courts are thus authorized to award damages computed upon the difference between the maximum legal rent and the rent actually demanded and received, it seems to me they necessarily are authorized to determine the maximum legal rent, and hence authorized to determine the amount by which the rent otherwise legally collectible is reduced by reason of a reduction of services.

*Schmoll, Inc.,* v. *Federal Reserve Bank* (286 N. Y. 503), *Atkins* v. *Stichman* (81 N. Y. S. 2d 497) and *Fox* v. *34 Hillside Realty Corp.* (N. Y. L. J., Jan. 12, 1949, p. 139, col. 6) are not to the contrary for two reasons, first, in making such determination the court is not reviewing any action taken by a Federal agency, and, second, the subject matter is not one exclusively within Federal jurisdiction (see *Matter of Tartaglia* v. *McLaughlin,* 297 N. Y. 419). The subject matter rather is within that broad field in which State courts may vindicate and protect rights granted by a Federal statute (see 286 N. Y. at p. 508); and fixing the amount by which the rent otherwise legally collectible is reduced by reason of a reduction in services is here necessary in order to vindicate and enforce the rights which plaintiffs have under the Federal statutes.

My consideration of the evidence leads me to the conclusion that defendant's reduction of services makes the rents plaintiffs have paid since July, 1948, above the maximum legally collectible by 15% of the amounts collected. Fifteen per cent of the $2,352.75 collected as rent for August, 1948, is $352.90. Three times that is $1,058.70. Plaintiffs accordingly are entitled to recover of defendant $1,058.70 in respect of the rents for August, 1948, and a like sum in respect of the rents for September and October, 1948, namely $3,176.10 plus $5,000 attorneys' fees, and costs.

Of the $6,000 deposited in court under the order of consolidation as security for the rents for November and December,

1948, and January, 1949, plaintiffs are entitled to 15% thereof and defendant is entitled to 85% thereof. Plaintiff Kidder is entitled to recover of defendant 15% of the $234.79 he paid as rent for November, 1948, and 15% of what he has paid for subsequent months if he has so paid. Plaintiffs are also entitled to deduct from the rent for each month subsequent to January, 1949, a sum equal to 15% thereof until defendant restores all the services it was rendering prior to July 1, 1948.

Defendant is not entitled to dispossess any of plaintiffs but is entitled, as above stated, to 85% of the $6,000 deposited under the order of consolidation.

I direct the entry of judgment accordingly.

The foregoing constitutes the decision required by the Civil Practice Act and judgment is to be entered thereon.